IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OGECHI FALL, §
§
    Plaintiff, §
§
V. § CIVIL ACTION NO. H-12-0265
§
MICHAEL ASTRUE, COMMISSIONER OF §
THE SOCIAL SECURITY §
ADMINISTRATION, §
§
    Defendant. §

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 11) and Memorandum in Support (Document No. 12), and Plaintiff's cross Motion for Summary Judgment and Memorandum in Support (Document Nos. 13 & 13-1). After considering the cross motions for summary judgment and briefing, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

---

[1] On August 19, 2012, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 16.

## I.      Introduction

Plaintiff Ogechi Fall ("Fall") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). Fall argues that: (1) "[t]he ALJ's reliance on noncompliance when making the disability determination is not supported by substantial evidence and does not comply with the relevant Social Security Ruling"; and (2) "[t]he ALJ's credibility findings are not supported by the record and prejudiced Fall's claim." Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment (Document No. 13-1) at 13, 17. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II.      Administrative Proceedings

On July 20, 1999, Fall applied for disability insurance benefits and supplemental security income benefits, claiming that she has been unable to work since July 9, 2007, as a result of bipolar disorder and anxiety. (Tr. 153-160; 163-166; 198). The Social Security Administration denied the applications at the initial and reconsideration stages. After that, Fall requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Harry L. Williams, Jr., held a hearing on December 16, 2010, at which Fall's claims were considered *de novo*. (Tr. 30-53). On January 13, 2011, the ALJ issued his decision finding Fall not disabled. (Tr. 16-24).

Fall sought review of the ALJ's adverse decision with the Appeals Council, including therein new evidence in support of her applications. (Tr. 4-9; 427-443). The Appeals Council will grant

a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.   20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.   After considering Fall's contentions in light of the applicable regulations and evidence, the Appeals Council found no basis upon which to grant Fall's request for review.  (Tr. 4-5).  The ALJ's decision thus became final.

Fall has filed a timely appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The parties have filed cross motions for summary judgment (Document Nos. 11 & 13).  The appeal is now ripe for ruling.

III.    **Standard for Review of Agency Decision**

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision  of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence.  42 U.S.C.§ 405(g).  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236

(5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.     Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).     The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:

> 1.    If the claimant is presently working, a finding of "not disabled" must be made;

> 2.    If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

> 3.    If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

> 4.    If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

> 5.    If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

5

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Fall had not engaged in substantial gainful activity since July 9, 2007, Fall's alleged onset date.  At step two, the ALJ found Fall had the following severe impairments: bipolar disorder, status post gastric bypass, depression, anxiety disorder, and panic disorder.  At step three, the ALJ concluded that Fall did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  The ALJ then, prior to consideration of steps four and five, determined that Fall had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels but with the following nonexertional limitations: she can have only occasional contact with the general public, no forced pace or assembly line work, and she must work in a structured setting."  (Tr. 21).  Applying that RFC, the ALJ found, at step four, that Fall could not perform her past work.  At step five, using that same RFC, and considering Fall's age, education, and work experience, the ALJ concluded that there were jobs in significant numbers in the national and regional economy that Fall could perform and that she was, therefore, not disabled. In this appeal, Fall challenges the ALJ's determination at step five.  In particular, Fall argues that the ALJ erred in considering her medication non-compliance as supportive of his disability determination because he failed to follow the requirements of Social Security Ruling 82-59.  In

addition, Fall maintains that the ALJ erred in assessing her credibility.[2]

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

The objective medical evidence shows that Fall suffers primarily with bipolar disorder, depression, and an anxiety disorder.[3]  She claims that she has suffered with depression for much of her life, and was hospitalized for her depression for the first time when she was fifteen.  However, as is relevant to her DIB and SSI applications, and her alleged onset date of July 9, 2007, the medical records first evidence her bipolar disorder and depression on June 8, 2007.

On that date, while serving in the military, Fall was admitted to the Air Force's inpatient mental health unit, with depressed mood, suicidal ideations and anxiety. (Tr. 283-295).  Her GAF upon admission was 30.  (Tr. 285).  She was diagnosed with a depressive and anxiety disorder, re-started on medications (Prozac) and participated in therapy.  (Tr. 285).  At the time of her discharge

---

[2] Fall makes no complaint about the Commissioner's consideration of the new evidence that was submitted to the Appeals Council.

[3] The ALJ listed Fall's "post-status gastric bypass" as a severe impairment.  There is no medical evidence in the record relative to that condition, and no argument has been made herein of any error associated with the ALJ's consideration of that impairment.  In addition, Fall's health care providers appear to refer to her panic disorder and anxiety disorder interchangeably.

four days later on June 12, 2007, her GAF had risen to 60.  (Tr. 285).  It was, however, recommended that she be administratively separated from the military.  (Tr. 283).

Following her discharge on June 12, 2007, the record shows that Fall was not seen again by any mental health professional until June 18, 2008.  At that time she was seen by Dr. G.K. Ravichandran at the Shamrock Clinic, who reported her symptoms and complaints as follows:

> Depressive symptoms characterized by episodes of depressed moods occurring daily, previously enjoyed activities are no longer pleasurable.  There is loss of energy or motivation, excessive worrying and fatigue.  Also has a sense of guilt, irritability, sadness, feelings of worthlessness, loss of appetite, decrease in sociability and sleep difficulty.  Patient also complains of difficulty concentrating and making decisions and difficulty thinking clearly.  Although there are wishes to be dead, no actual suicidal plans are present.  PTSD is characterized by depression, fear, flashbacks, child like regression and recollections and panic states.  Patient suffers from extreme disability as a result of the same.  Patient has sufficient trauma leading to this syndrome.  Bipolar disorder characterized by symptoms of extreme mood swings, "racing thoughts" and periods of intermittent increased frustration and anger management.  Patient has sleep difficulty and intermittent crying spells.  The symptoms have become out of control recently.  The other features include intermittent elevated mood and excessive talking.  The onset of symptoms was gradual over a period of time.  Anxiety symptoms characterized by periodic panic attacks.  These occur[] a few times a week.  Avoidance of certain locations or situations for fear they will precipitate an anxiety attack.  A feeling of apprehension that something bad is going to happen; feelings of depersonalization, dizziness during anxiety episodes; uncomfortable sensations of excessive muscular tension; phobic symptoms that are recently predominant.  A rapid heart rate during anxiety episodes described as emergency shortness of breath as if breathing is going to stop.  Sleep disorder and has a very severe problem falling asleep.  Mood swings are characterized by frequent crying spells or becoming extremely upset and frustrated and very angry.  Patient becomes uncontrollable when the anger flares up and often causes crisis like situation at home.

(Tr. 345).  Upon mental status exam, Dr. Ravichandran found Fall to be guarded, distracted, somewhat tense, anxious, "glum" and downcast.  (Tr. 345-346).  Her thought contents, body posture, attitude, and facial expressions were consistent with her reported depression and anxiety symptoms.  (Tr. 345-346).  Her affect was constricted but she had no suicidal or homicidal ideations.  (Tr. 345-

346).  Her associations were "circumstantial but not necessarily illogical," her memory functions were intact but fluctuated "during prolonged conversation," her insight and judgment were assessed as poor, and her reasoning capacity was unpredictable.  (Tr. 345-346).  Dr. Ravichandran diagnosed Fall with a panic disorder, post traumatic stress disorder, dyssomnia, and a mood disorder, prescribed Xanax and Symbyax, and instructed Fall to return for follow-up in one month.  (Tr. 346).

One month later, on July 18, 2008, Fall reported that she continued to have problems sleeping.  (Tr. 347).  Vistaril was added to her medications.  (Tr. 347).  On a follow-up exam on July 30, 2008, Fall reported that she was unexpectedly pregnant.  (Tr. 348).  Her medications were discontinued at that time and she was referred to an OB-GYN.  (Tr. 348).  On August 13, 2008, Fall was re-started on Xanax and Symbyax after approval by an OB-GYN.  (Tr. 349).  A month later, on September 10, 2008, at a medication management appointment, no new symptoms or complaints were noted, and Fall was continued on both Xanax and Symbyax.  (Tr. 350).  On October 7, 2008, at her next medication management appointment, Fall reported having nightmares and being unable to sleep.  She was diagnosed at that time with bipolar disorder, and post traumatic stress disorder, and prescribed Xanax and Tofranil.  (Tr. 351).

Fall was next evaluated on November 12, 2008, in Madera County, California, where she had recently re-located.  At that time, a comprehensive behavioral health services assessment was conducted.  (Tr. 298-302).  During that three hour long assessment, Fall reported that she believed her pregnancy was exacerbating her bipolar symptoms, with her mood changing from "minute to minute."  (Tr. 298).  She also reported that she was homeless and had been staying at the Madera Rescue Mission with her two children, that she had been off her bipolar medications, and that her mind raced, she had problems sleeping, was irritable, and had no motivation.  (Tr. 298).  Upon

mental status exam, Fall's affect was constricted, motor activity was calm, her mood was depressive, her thought processes were circumstantial, and her speech was slowed. (Tr. 299). Her judgment was thought to be mildly impaired, her memory and insight were both intact, and she was oriented to person, time, place and situation. (Tr. 299). Fall was diagnosed with bipolar disorder and scheduled for a follow-up visit on November 19, 2008. (Tr. 301). There is no evidence in the record that she kept this appointment. Instead, the record shows that she was next seen on December 10, 2008, for an individual therapy session. (Tr. 305). At that time, Fall reported that she still had racing thoughts, uncontrolled worry, difficulty sleeping, and anxiety, but was less depressive since finding an apartment to rent. (Tr. 305). On December 26, 2008, an unscheduled phone contact was made to Fall, whose baby had recently died in utero and who had undergone a c-section delivery of the fetus. (Tr. 307). Over the phone, Fall expressed anger and outrage over the loss of her baby and the way she was treated by the hospital and funeral home. (Tr. 307). By the end of the conversation, Fall had calmed down somewhat and committed to attending her next scheduled visit with her psychiatrist. (Tr. 307).

That visit with her psychiatrist took place on December 30, 2008. (Tr. 308-311). Fall stated that she had recurring episodes of mania and depression, problems sleeping, and mind racing. (Tr. 308-309). Upon mental status examination, Fall's mood was anxious, but her affect was appropriate, her motor activity was calm, her thought processes, memory, judgment and insight were all intact, and she had no hallucinations or delusions. (Tr. 310). She was diagnosed with bipolar disorder with "mood incongruent" and psychotic features, and was assessed a GAF of 55. (Tr. 310). She was prescribed Buspar and Seroquel, and instructed to continue with therapy. (Tr. 311).

In a follow-up visit with a psychiatrist on January 14, 2009, Fall stated that Buspar "made

her uncomfortable" and Seroquel made her "hallucinate." (Tr. 312-313).   At that visit, Fall's affect

was appropriate, her mood was euthymic, her motor activity was calm, her thought processes,

memory, and insight were intact, and her judgment was fair.  (Tr. 312).  Due to the medication side

effects, both Buspar and Seroquel were discontinued and she was started on Zyprexa. (Tr. 312).

On March 3, 2009, a summary of her treatment through the Madera County Behavioral

Services, was completed upon her discharge from those services.  The treatment summary states:

> Client was receiving individual therapy and medication management. . . . Client did
> not cooperate with her psychiatrist recommendations and prescriptions.  She tried one
> pill each that was prescribed of the Seroquel and Buspar but wanted to receive the Rx
> she received in Texas, called Symbiax (a combination of Zyprexa and Prozac that
> MediCal doesn't cover).  Client also verbalized wanting Xanax and upset that Dr.
> Aquino wouldn't give her the benzodiazepine.  Therefore client's objectives for
> taking her medication correctly and having less symptoms was not achieved.  She
> was given a prescription for Zyprexa, which she appears to have lost.
>
> One of client's objectives was to attend prenatal care, unfortunately her fetus died at
> 7 months gestation.  Client was very disturbed to have a deceased fetus inside her.
> She had a C-Section for the fetal demise, and subsequent umbilical hernia surgery.
>
> Client appears to perceive most service systems as working against her, and that
> continuously bad things happen to her.  She was asked to leave the Madera Rescue
> Mission, she used her homeless benefits at Casa Grande, after spending one night in
> her truck.  She was next on the list for New Outlook to receive a subsidized
> apartment but instead rented a different apartment.  Recently she did a hit and run of
> three parked cars in a parking lot and had her vehicle impounded.  She also had a
> physical  altercation with her neighbors and states she beat them up. . . . Ogechi has
> no local support.  Her family resides in Houston Texas.  She met one woman at the
> Mission that watched her children while she was in the hospital giving birth to her
> deceased baby boy.  Ogechi became angry with the woman and severed the
> relationship.  She was involved in the Yosemite Christian Community Church.  She
> is thinking of sending her boys back to Houston to live with her sister until she gets
> her vehicle back, gets into mental health with Fresno BHS and gets the medications
> she will take.  She has an appointment with Dr. Ziyar, a psychiatrist in Fresno in 3-4
> weeks.  She is aware of crisis numbers and Fresno services.

(Tr. 303).  At the time she left Madera County Behavioral Health Services on March 3, 2009, Fall's

GAF was 49.  (Tr. 304).

Fall saw Dr. Latif Ziyar in Fresno, California, for the first time on May 29, 2009.  At that first visit, Fall reported that she had bipolar disorder, and complained of mood changes, severe anxiety and paranoia, difficulty sleeping, and irritability.  (Tr. 321).  Dr. Ziyar found Fall to have significant impairments in daily activities and social relationships, with a need for mental health treatment.  (Tr. 322).   Her prognosis was determined to be good, she was continued on Prozac and Zyprexa, and prescribed twelve individual therapy sessions.  (Tr. 322, 324).   The record shows that Fall saw Dr. Ziyar on only one other occasion: July 16, 2009.  (Tr. 319).  At that time, she complained about being depressed and paranoid.  She was continued on Prozac and Zyprexa.  (Tr. 319).  On July 29, 2009, from a review of his records, Dr. Ziyar wrote in a letter to the Department of Social Services that, "To the best of my knowledge, this patient is capable of working."  (Tr. 330).

Following her last visit to Dr. Ziyar on July 16, 2009, the record shows that Fall's next contact with mental health professionals took place a year later, on July 16, 2010.  (Tr. 363-375). By that time, Fall had returned to Houston, Texas, and was brought by law enforcement officers to the Harris County Psychiatric Center following aggressive behavior towards her sister.  (Tr. 363). There, she was hospitalized between July 16, 2010, and July 22, 2010.  (Tr. 363).  Upon her admission, Fall denied being aggressive, and was pleasant and calm.  She did report, however, that she had been feeling depressed the last year following the death of her unborn child, that she had difficulty sleeping, and had feelings of worthlessness.  (Tr. 363).  She also reported a manic episode three days prior to her admission, during which she was "easily agitated, hypertalkative, +RT," had increased energy and poor sleep.  (Tr. 363).  Fall reported taking Effexor, Geodon and Klonopin, and was current on her medications.  (Tr. 363, 364).  Upon mental status exam, she had a diminished

rate, tone and volume of speech, her mood was depressed, her affect was depressed/dysphoric, her insight and judgment were poor, but her thought processes were logical and goal-directed and she was oriented x4.  (Tr. 365).  She was diagnosed with bipolar disorder, and assessed, upon her admission, a GAF of 25.  (Tr. 367).  At the time of her discharge on July 22, 2010, after receiving medication and therapy, her condition was "much improved," with her GAF rising to 48.  (Tr. 371, 373).  She was discharged with prescriptions for Celexa, Risperdal and Divalproex and referred to the MHMRA of Harris County for follow-up.  (Tr. 371).

In connection with the initiation of services at MHMRA of Harris County, Fall was determined to need both medication services and assignment to a community based case worker "who will provide intensive case management, skills training, and pre-employment training as needed."  (Tr. 412-414).   At her first visit on August 4, 2010, Fall described her symptoms as "hyperactive, mind racing, scream, crying, talk too fast, changes subject over and over during conversation, exercise to the point that she cannot even walk, she goes on spending sprees–ends up with clothes in closet with tags on them and never used [ ] she may get very sexual manic episode [ ] lasts for 24 hrs to 3 days [ ] depressive episodes last longer - up to a wk to 3 wks when she has low energy, loose interest, suicidal thoughts - denies current suicidal thoughts."  (Tr. 397).  She also reported that she was "doing a little better on meds – she did not get the prescription filled (from [Harris County Psychiatric Center] and went back on her old meds of tegretol and geodon.  she is not hearing voices, mood is still depressed and has high anxiety, she is not sleeping well. not suicidal or having violent thoughts."  (Tr. 397).  Upon mental status exam, Fall speech had a normal rate and rhythm, her mood was anxious and depressed, her affect was tearful, her thought process was goal directed, she reported no hallucinations, delusions, suicidal ideations, or homicidal ideations, her

sensorium was alert, her cognition was grossly intact and her insight was fair.  (Tr. 399).  Her medications (Tegretol and Geodon) were adjusted, Atarx and Benedryl were added, and she was instructed to follow-up in the clinic in two weeks.  (Tr. 399-400).  At that two-week follow-up visit on August 19, 2010, Fall reported that she was "too sleepy" and that her mood remained unstable "sometimes depressed and sometimes too excited."  (Tr. 393).  Her mental status exam was essentially the same as that from August 4, 2010, but her bipolar disorder symptom scale had stabilized.  (Tr. 393, 397).  Fall was instructed to return to the clinic for follow-up in three weeks.  (Tr. 395).  Three weeks later, on September 9, 2010, after advising that she was not sleeping well, was nauseated, and increasingly anxious, her medications were again adjusted.  (Tr. 383-385).  At her next visit in October 4, 2010, the treatment note states that Fall reported she:

> ran out of meds last wk and [complained of] not sleeping well. she says when she ran out of meds she started taking some old geodon. feels she did well on the meds and denies current suicidal or violent thoughts.

(Tr. 376).  Fall's mental status exam on that date was much improved, with her attitude cooperative, her motor activity normal, her speech having a normal rate and rhythm, her mood euthymic, her affect appropriate, her thought processes goal directed, her sensorium alert,  he cognition grossly intact, and her insight fair.  (Tr. 376-377).  Fall was continued on her medications and instructed to return to the clinic in eight weeks.  (Tr. 378).  This is the last progress note in the record from MHMRA of Harris County.

The last mental health treatment in the record occurred between April 17, 2011, and April 24, 2011, when fall was hospitalized at Westbury Community Hospital.  (Tr. 428-443).  At the time of her admission on April 17, 2011, Fall reported that she had

14

been experiencing a depressed mood along with manic symptoms since at least two to four weeks. She has trouble sleeping. She has racing thoughts. She feels hopeless and helpless and she is also suicidal without a plan. The patient also reports paranoid delusions and believes that people are trying to hurt her and her children. She has auditory hallucinations in which she hears people, quote, whispering, unquote, to her things that she cannot understand. These auditory hallucinations are not command in nature. The patient also reports visual hallucinations and claims that she sees insects and shadows. The patient is very disturbed with all her symptoms and wanted to get inpatient care and her medication adjusted. She reports that she has been compliant on her outpatient medications which include Geodon 80 mg p.o. q.a.m. and 160 mg p.o. q.h.s.; Celexa 20 mg p.o. q.h.s.; Tegretol 200 mg p.o. b.i.d.

(Tr. 430). At the time of her admission Fall was assessed a GAF of 20. (Tr. 431). With an adjustment of her medications, and a change to Depakota, Seroquel and Wellbutrin, Fall was discharged on April 24, 2011, with a diagnosis of "schizoaffective disorder, bipolar type, in remission," chronic mental illness, and a GAF of 35. (Tr. 428). She was instructed to follow up with her mental health provider in two weeks. (Tr. 428).

In all, the objective medical evidence supports the ALJ's determination that Fall's bipolar disorder, depression and anxiety/panic disorder are severe impairments. But that same objective medical evidence, because it is sporadic and sparse, particularly between the dates Fall was hospitalized, also supports the ALJ's determination that Fall's bipolar disorder, depression and anxiety/panic disorder do not render her unable to engage in any type of gainful activity. Fall certainly has some significant mental issues that have, on occasion, required hospitalization, but between those hospitalizations her medical and mental health records are sparse. And, when there are such medical or mental health records, they do not show that Fall's mental impairments are disabling. Instead, those records show that between her hospitalizations in June 2007 and July 2010, Fall's main complaints were problems sleeping, racing thoughts, and depression, but her GAF scores, where they are included in the record, were close to, or exceeding, 50. (Tr. 285; 308-311;

15

312-313; 363-375).[4]  In addition, between her hospitalization in July 2010 and April 2011, there is

very little in the form of progress notes, with the latest note reflecting a "much improved" mental

status examination. (Tr. 376-377).  The objective medical evidence, considered as a whole, does not

support the conclusion that Fall is unable to engage in any type of substantial gainful activity.  Thus,

the objective medical evidence factor supports the ALJ's decision.

In this appeal, Fall does not directly challenge the ALJ's assessment of the objective medical

evidence.  Instead, Fall argues that the ALJ, without reference or adherence to SSR 82-59, impliedly

determined that she would not be disabled if she was compliant with her medications.  Fall argues

as follows:

> When making his findings regarding Fall's disability claim, the ALJ's repeated
> notations of noncompliance indicate that noncompliance was central to the disability
> determination. . . . While[ ] SSR 82-59 normally does apply to a claimant's eligibility
> for benefits after a finding of disability has been made, courts have noted that, "the
> regulatory scheme promulgated by the Secretary does not expressly dictate how the
> noncompliance inquiry under 20 C.F.R. § 404.1530 meshes with the sequential
> analysis of disability under 20 C.F.R. § 404.1520."  *Preston v. Heckler*, 769 F.2d
> 988, 990 (4th Cir. 1985).  As the case law shows, courts have inferred reliance on
> noncompliance and required compliance with SSR 82-59 at various procedural steps
> of the disability determination process.  Further, the ALJ relied on Fall's
> noncompliance to reject her allegations of disabling limitations.  The ALJ's repeated
> citations to noncompliance show that the issue was considered as more than just an
> unfavorable credibility factor.  A reversal and remand are warranted so that Fall's
> noncompliance may be further explored and any justifiable excuses for her

---

[4] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to
psychological, social and occupational functioning."  *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir.
2001) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition (DSM-
IV), at 32).  A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning
(e.g., few friends, conflicts with peers or co-workers).  DIAGNOSTIC AND STATISTICAL MANUAL OF
MENTAL DISORDERS, 4th Edition, Text Revision (DSM-IV-TR), at 34.  A GAF of 41-50 denotes
"serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep
a job)."  *Id.*  Most of Fall's GAF scores were assessed in connection with her hospitalizations.

noncompliance may be evaluated.

Plaintiff's Memorandum in Support (Document No. 13-1) at 15, 17.

SSR 82-59 is the Social Security Administration's policy statement and stated criteria "for a finding of failure to follow prescribed treatment when evaluating disability under titles II and XVI of the Social Security Act and implementing regulations." Under SSR 82-59, "[a]n individual who would otherwise be found under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." Under SSR 82-59, failure to follow prescribed treatment is an issue "only where all of the following conditions exist:

> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and
>
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death;
>
> 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
>
> 4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Thus, for the issue of "failure to follow prescribed treatment" to be identified and addressed under the criteria identified in SSR 82-59, the evidence must first establish "that the individual's impairment precludes [that individual from] engaging in any substantial gainful activity." *See Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995) ("The procedures that SSR 82-59 mandates, however, only apply to claimants who would otherwise be disabled within the meaning of the Act.

As discussed above, Roberts would not otherwise be disabled due to obesity because she failed to meet the duration requirement. Thus, she had no right to enjoy the protections of SSR 82-59 because the Secretary did not premise the denial of her benefits solely on Robert's failure to follow prescribed treatment."), *cert. denied*, 517 U.S. 1122 (1996); *Mack v. Commissioner of Social Security*, 2011 WL 989813 *2 (11th Cir. 2011) ("While we have not specifically addressed SSR 82-59, the Circuits that have considered the policy statement have held that the procedures mandated in SSR 82-59 'only apply to claimants who would otherwise be disabled within the meaning of the Act.'"); *Elam v. Barnhart*, 386 F.Supp.2d 746, 758 (E.D. Tex. 2005) (where there was no finding that any of the claimant's impairments were disabling or that treatment would restore the claimant's ability to work, the ALJ was not obliged to consider the reason for the claimant's failure to follow prescribed treatment).

Where it can be ascertained from the ALJ's decision that it is the claimant's non-compliance that forms the basis of the either the ALJ's RFC determination or the ultimate disability determination, whether the ALJ so states or not, SSR 82-59 must be followed. *See Lindsey v. Astrue*, 2011 WL 817173 (N.D. Tex. 2011) ("the ALJ relied almost exclusively on substance abuse and noncompliance with prescribed treatment to determine Plaintiff's RFC, which provided the basis for the decision that Plaintiff was not disabled"). In contrast, where it can be ascertained from the ALJ's decision that the claimant's non-compliance was considered by the ALJ in connection with assessing the claimant's credibility and in making a determination as to the severity of the claimant's alleged subjective symptoms, SSR 82-59 need not be mentioned or followed. *See Hawkins v. Astrue*, 2011 WL 1107205 *3 (N.D. Tex. 2011) ("Because the ALJ considered plaintiff's failure to take prescribed medications only in assessing her credibility, and not in determining whether she would be able to

work had she followed her medication regime, the judge was not required to follow the procedures set forth in 20 C.F.R. § 416.930 and SSR 82-59."); *Seibert v. Astrue*, 21010 WL 6389303 * 10 (N.D. Tex. 2010) ("The Court, after reviewing the ALJ's decision as a whole, concludes that the ALJ did not base his denial of benefits on Seibert's non-compliance with taking his medication but, instead, found that such non-compliance was one factor that undermined the credibility of Seibert and Prejean.").

Here, a thorough review of the ALJ's decision, including his every mention of, or reference to, Fall's failure to comply with prescribed treatment and/or medication leads to the conclusion that the ALJ did not, either explicitly or impliedly, determine that Fall would not be disabled if she was compliant with her medications. In his decision, the ALJ referenced Fall's non-compliance as follows:

> The claimant is a 32-year-old (younger) individual. She has an [sic] 12th grade (high school) education, and she completed four or more years of college. She has past relevant work as a security officer and army medic/medical assistant. She alleges disability due to mental health problems; however, the record demonstrates that her impairments can be controlled with medication.

> * * *

> . . . . Overall, Dr. Pollock testified that the claimant's impairments can be controlled with medication, but that there has not been a consistent medication modification to control her symptoms.

> * * *

> In November 2008, the claimant voluntarily underwent a mental assessment with Madera County Behavioral Health Services. She reported that her bipolar symptoms were exacerbated by pregnancy. However, the record indicates that the claimant was off her medication at that time. She was diagnosed with bipolar disorder and started to receive individual therapy and medication management. Her progress notes indicate that she did not cooperate with her psychiatrist recommendations and prescriptions, and she was discharged from services in March 2009 (Exhibit 2F,

pages 3 and 8).

\* \* \*

> The claimant began receiving treatment with the Mental Health and Mental Retardation Authority of Harris County (MHMRA) in July 2010 after being admitted to the Harris County Psychiatric Center (HCPC) for aggressive behavior.  She was discharged after six days, and appeared to be doing well on her medication (Exhibits 12F, page 12, and 13F, page 30).  The claimant's treatment notes from MHMRA also indicate that her condition improved with medication (Exhibit 13F, page 1).  However, her treatment notes show that she goes for periods of time without refilling her medications, which suggests that the claimant's symptoms are not as limiting as the claimant has alleged in connection with this application (Exhibit 13F, pages 1 and 22).

(Tr. 18, 21, 22).  But, most of these references are made in connection with the ALJ's assessment of Fall's credibility.  *See* Tr. 20-21 ("once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning.  For this purpose, whatever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record."); Tr. 21 ("After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.").  And, these references to Fall's medication non-compliance are set against the ALJ's explicit determination that Fall's alleged limitations "are not fully supported by the

20

medical record," that "the impact of [Fall's] symptoms does not wholly compromise [Fall's] ability to function independently, appropriately, and effectively on a sustained basis," and that "the intensity and persistence of the symptoms alleged is not consistent with the medical record signs, laboratory findings, and the medical record as a whole." (Tr. 22).

As set forth above, the objective medical evidence supports the ALJ's determination that Fall can engage in substantial gainful activity.  In turn, that determination and the ALJ's reliance on Fall's medication non-compliance in making his credibility assessment, render SSR 82-59 inapplicable. The objective medical evidence factor therefore supports the ALJ's decision.

### B.    Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan,* 919 F.2d 901, 905 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker,* 660 F.2d 1078 (5th Cir. 1981).  Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for

determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)

(quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

There are two main expert medical opinions in the record, and both support the ALJ's

determination.   First, the expert medical opinion of Dr. Richard Pollack, a licensed clinical

psychologist, who testified at the hearing before the ALJ, is that Fall's impairments do not meet the

requirements of any of the Listings.  (Tr. 48).  He further opined at the hearing, from his review of

Fall's medical records, that she had the following functional limitations:

> The biggest one is working around people, and she should work in a situation where
> she has only occasional contact with the public.  I think she can handle normal
> contact with co-workers and supervisors, with only occasional contact with the
> public.  Similarly, with stress, she needs to work at a job that is lower on the stress
> continuum.  All jobs have stress, but she needs to work in a job where there's no
> floor space or (INAUDIBLE).  We don't have any testing, but certainly from her
> records and her testimony, she appears to be bright enough that I don't think there's
> need for intellectual limitations.

(Tr. 48).  The ALJ incorporated these functional limitations into his RFC.  (Tr. 20).  Second, there

is the one sentence opinion of Dr. Ziyar on July 29, 2009, that "[t]o the best of my knowledge, this

patient is capable of working."  (Tr. 330).  As one of Fall's treating physicians, the ALJ gave this

opinion significant weight.  (Tr. 22).

As all the expert medical opinions in the record support the ALJ's determination, this factor

also weighs in favor of the ALJ's decision.

### C.   Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the

claimant's testimony and corroboration by family and friends.  Not all pain and subjective symptoms

are disabling, and the fact that a claimant cannot work without some pain or discomfort will not

render him disabled.  *Cook,* 750 F.2d at 395.   In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Fall testified at the administrative hearing that she doesn't like being around people, she feels paranoid and threatened when she's around people, she hallucinates on occasion, she has anxiety attacks "all the time," she has problems sleeping because of her racing thoughts, she can't concentrate, she occasionally has problems eating, and has problems with her memory, including forgetting appointments.  (Tr. 40-44).  The ALJ, in considering Fall's subjective symptoms, found that the Fall's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms" were not fully credible.  (Tr. 21).   In making that credibility assessment, the ALJ considered that Fall had not fully cooperated with her psychiatrist, and had been non-compliant with her prescribed treatment and medication.  (Tr. 22).   In addition, the ALJ pointed to Fall's ability to "perform household chores, prepare meals, and tend to her children."  (Tr. 21).

Fall argues in this appeal that the ALJ gave short shrift to his obligation to assess her subjective symptoms, and relied on "boilerplate" language in making his credibility assessment.  In addition, Fall maintains that the record does not support the ALJ's credibility assessment because while she testified that she did household chores and took care of her children, she also testified that she sometimes went days without bathing, she does not participate in social activities, she only leaves the house when she has to, she sometime hallucinates, and has had problems eating.

The record shows that Fall admitted to being able to cook, clean and take care of her two children, both of whom are disabled.  As neither the objective medical evidence nor the expert

medical opinions in the record supported Fall's testimony that her subjective symptoms are disabling, the ALJ rejected as not fully credible Fall's testimony about her subjective symptoms.  In addition, as is set forth above, the ALJ referenced Fall's non-compliance with prescribed treatment and medications as supportive of his credibility determination.  In that regard, the record shows that the medical expert questioned Fall at the administrative hearing about her medication and treatment non-compliance. (Tr. 46)  In response, Fall indicated that the medication she was taking didn't really seem to help her.  (Tr. 46-47).  But, she also testified that she didn't think she was on the correct medication. (Tr. 41).

In all, whether the ALJ used "boilerplate" language in concluding that Fall's allegations and testimony as to her subjective symptoms was not fully credible, there is substantial evidence in the record to support the ALJ's credibility determination.  Therefore, this factor also weighs in favor of the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

As of the date of the administrative hearing, Fall was thirty-two (32) years old, had a high school education, and had past work experience as a security officer and a medical assistant.  (Tr. 34, 50).  The ALJ, having considered Fall's medical records, the objective findings and opinions of the medical experts, and Fall's testimony as to her subjective complaints, determined that Fall had

the residual functional capacity to perform all exertional levels of work, limited by only occasional contact with the general public, no forced pace or assembly line work, and the need for a structured setting.  (Tr. 20).  Based on that determination, the ALJ questioned a vocational expert about Fall's ability to do her past relevant work, or any other work which exists in significant numbers in the economy.  The vocational expert testified that Fall would not be able to do her past work, but would be able to do work as a laundry worker or a kitchen helper.  (Tr. 50-51).

Given the ALJ's RFC, which is supported by substantial evidence in the record, and the testimony of the vocational expert as to the availability of jobs that fall within Fall's RFC, this factor also weighs in favor of the ALJ's decision.

## VI.    Conclusion and Order

Based on the foregoing, the conclusion that substantial evidence supports the ALJ's decision, and that the ALJ properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

Signed at Houston, Texas, this 3rd day of December, 2012.

Frances H. Stacy
United States Magistrate Judge

25